Our first case today is Olson v. Gossett, No. 23-1125. Ms. Dynkar. Thank you, Your Honor. May it please the Court, I am Irene Dymkar and I represent the plaintiff, Eric Ollison. This is a case about direct and supervisory liability of a prison warden. The question is whether the warden knew that the risk of allowing a dysfunctional and grossly deficient prison health care system to go unchecked for months, even years, was going to lead to injury to somebody, to some inmate. Plaintiff was a 30-year-old man who needlessly suffered renal failure and brain damage because of warden's failure to act. We're asking the Court to vacate the Dobert order that barred all opinions of the certified correctional health care expert, Ralph Selk, and a nephrologist, Monpreet Samra, also to reverse the order dismissing warden Nicholson from the case on a 20D6 motion, reverse summary judgment for warden Gossett, and vacate the orders where the Court made factual findings that warden Gossett did not become the assistant warden until March of 2013 and warden until September. Ms. Dymkar. Yes. Yes. Can you slow down for a second? Because I thought the only arguments you were making in your brief were about the two wardens, Nicholson and Gossett. Yes. Is that right? That's right. They're the only, okay. They're the folks who are still targeted. All right. Yes, Your Honor. So we don't need to worry about any other defendants? Right. Okay. Thank you. Ms. Dymkar, can I follow up on that? Yes. Go ahead. I'm interested in your complaint, okay? I'm interested in the complaint. And what I'm interested in is, in Reynolds, we were very clear that as to how you get to adding additional facts during discovery and after the motion to dismiss, you first have to make a sufficient showing in the complaint, the defendants are on notice of some systemic supervisory problem. And so I'd like you to point me, I have your complaint here. What specific paragraphs in your complaint should, I mean, I see all the allegations here with respect to Mr. Olson, and look, it's horrible things that happened because of these, this renal failure, it seems. But what facts would have put these two wardens on notice that they were being sued for some systemic supervisory liability issue? Well, first of all, we have about a dozen paragraphs. So which ones? Okay. 27, 29, 30, 31, 32. Okay, hold on. Hold on. Okay. But like 27 just says, upon information and belief, Nicholson was employed by the IODC as warden, and therefore functioned as warden for part of the time that Mr. Olson was incarcerated there. What does that have to do of putting him on notice of a supervisory, systemic supervisory liability problem? We have the other paragraph. Okay. Which one? Okay. I don't have exactly what's in each one, but 29, 30, 31, 32, 102. These just say they're responsible for the provision of care, which is no doubt true. They're responsible for inmates and care provided by IDOT, as well as employees by Wexford. They failed to give plaintiff continuity of care, failed to send him to specialists, ignored cries for help. Where does it say the warden did that? That's my question. I'm sorry. I don't have the complaint in front of me, but I do have the paragraphs, and it's a group pleading. It says Nicholson and others failed to give . . . Ms. Demker, could I ask you, we have . . . this is an unusual case, but I want to get a response to Judge Kirsch's question. I thought most of this all was aired out in your September 14, 2020 motion to modify the early dismissal of Nicholson after you'd gotten the discovery from Wexford and the doctors and all of Moore's emails showing that the wardens were on notice of this dysfunctional health care system, and where you were asking . . . that's where you laid all that stuff out for the district court, right? That's right, Your Honor. We tried to pull Nicholson back in once Gossett tried to change his dates of employment. We said, look, if you're not . . . if you weren't there, then Nicholson was there, and we alleged many additional facts that Nicholson allowed the health care unit administrator position to remain vacant. This is at Record 369, is our motion, that he knew of inmates . . . This is where that part of the case took its most concrete shape. That's when we knew some facts. I mean, when you start off the lawsuit, you don't know the facts. So, are you saying we need to overrule Reynolds? Because in Reynolds, we say . . . here's what we said, I'm going to read it to you. Therefore, although the plaintiff is required to plead more than bare legal conclusions to survive a motion to dismiss, once the plaintiff pleads sufficient factual material to state a plausible claim, that is sufficient to put the defendant on notice of a plausible claim against it, nothing precludes the plaintiff from later suggesting to the court a set of facts consistent with the well-pleaded complaint that shows the complaint should not be dismissed. So, there's two steps. First, you have to plead the claim in sufficient facts to put the defendant on notice. Second, discovery can supplement those well-pleaded facts, but where are the well-pleaded facts in the first instance? In the first instance, it's the paragraphs that I mentioned to the court. We didn't have specific facts at that point. We knew that there were deficient practices in the health care unit. The warden was responsible for the health care unit, and that he turned a blind eye to how it was functioning. But where does it say that, other than with respect to your client's care, where does it say that there's this systemic problem in the care of the inmates? Where do you have paragraphs that say, it goes beyond the care that my specific client received, and it's a systemic problem? We do say that he was responsible for the health care unit. No doubt. Okay. And that it was malfunctioning, and that the paragraphs that I read to you say that Olison was not getting the care he needed, and he did not get referred out to any specialists. But then, you can always add to a complaint. But that doesn't... I'm with you, but I'm pushing you on the systemic problem. We see a lot of Eighth Amendment delivered indifference claims, a lot. You can't just plead, my client received inadequate health care. The warden is responsible. And then engage in a fishing expedition and discovery, and then say, okay, now we have sufficient facts to sue the warden because we've discovered all these additional problems that lead to systemic supervisory liability. And it seems to me like that's what's happening here. Well, a supervisor's specific knowledge of his subordinates' activities don't have to be detailed in the complaint. That's the Burks case. Knowledge and intent may be pleaded in a clusery fashion, and a lack of detail does not permit dismissal at the pleading stage before discovery. During discovery, we were learning things as we went along, and discovering was very contentious. There were many discovery motions brought until we got some of the information that ended up being the silver bullet, which were the emails. So, when we moved to modify the order dismissing Nicholson, we said, look, this is what we know. We know that Nicholson knew all this. These are the additional facts. So that was before the court at that point. And this court has said that even on appeal, you can set forth facts to help revive a motion to dismiss. That's Bell v. Publix Supermarket. And so, this court could even consider Salk's and Samra's reports in determining whether the dismissal motion was proper or not. Could I ask you to turn for a second to the Daubert issues and Salky and Samra? Yes. And I guess on Samra, both of their expert reports were prepared while the doctors in Wexford were still in the case, right? Yes. And that was obviously the principal focus. Before we get into more substance, by the way, is the settlement amount with Wexford and Company public? Is it what now? Is it public? Yes. What's the amount? It is $3 million. I'm not surprised, frankly, given the evidence we've got here. With respect to Dr. Samra, it's frankly hard for me to see how she helps with the claims against the—with the summary judgment issues against the wardens. But if the case were to go to trial, I take it her medical evidence would be related to damages and causation. Well, I think it's important to focus on the last two weeks that Eric Olson was at Illinois River. Because at that point, there is no doctor there. There's no medical director because Dr. Priby is not showing up. And she is even ordered to leave because she's being so disruptive during a flu epidemic. There's no healthcare unit administrator, and there should have been. And that's what—that's one thing Ralph Salk said, that it was reckless not to have— I'm trying to take them one at a time. Samra, I don't see how she really helps with summary judgment against the wardens, but I see how she might be needed at trial, and I'm asking you whether you disagree with that. I do, and I guess maybe I was coming about it in a roundabout way. She can say—she can point out that Eric Olson was not seen by a doctor after January 2nd because of some of the warden's actions, and that she did not receive any medical attention at all from January 8th to January 15th. And there was a consequences of that— It's causation. Right.  Causation. Okay. That's it. I'm not sure that's really an issue in the summary judgment, but it would be at trial.  Now, Salky has a lot of material that probably, frankly, is not admissible, including his opinions about the warden's qualifications for his job. But I can see him perhaps having some relevance in a few things on the wardens, but I don't see how you actually really need him, given all the emails and the Moore testimony. We do think we need him because some of this is circumstantial evidence, and a jury needs to understand how a prison works. It's not like orange is the new black. They have to understand how the system works, and that an inmate doesn't have a choice to go somewhere else. It is really the warden who's responsible for the care of an inmate. And Ms. Dimker, can I also ask you to—the defendants have raised some hearsay objections concerning the Wexford emails and so on. I will not claim to have read every page of the Moore deposition yet, but I gather you went through and had her authenticate those emails and adopt them. Every single email. Stacey Moore. Yeah. So we had two depositions. One deposition with her, she said, I don't remember anything. I don't know. It was a long time ago. Second one, when we had the emails, we said, what about this email where you say this is something egregious that's going to happen? This is, you know, we are just holding our breath. We've got to get rid of her. All these emails. So we said, okay. And you said you talked to the warden. She said yes. So it was only when we got the emails, we had the second deposition, went through each email. She said, I wrote that email. That's what happened. So we're going to call her at trial. Yeah. So it's not going to be hearsay. We happen to have it— Well, it's not hearsay now in the summary judgment because you've got her testimony. That's right. That's right. Thank you for correcting me. Yes. So, Ralph Selk, first of all, his qualifications are perfect for this case. He's worked at Illinois River. He's someone who has worked with prison administration. He's worked with health care units. He's evaluated health care systems for certification. He knows what he's talking about. And what the judge got hung up on, that he was a medical person. Ralph Selk is a nurse. He's an RN. That a medical person can't tell a non-medical person how to do his job. And he wasn't doing that. He was just saying there are medical consequences to non-medical decisions. Like, if you don't have a health care unit administrator, nobody's running the show. If you allow the absenteeism of the doctor and she's not there, there's no doctor there. And you're responsible for that because the buck stops with you. So, on that score, this may be an issue for a potential trial. Let's take your version of the facts. It's the summer of 2013, if I remember correctly. Yes, sir. And Dr. Grebe is a big problem. We've got Moore worried about something. We're all going to hold our breaths as she's telling the wardens. But the wardens are saying, we'd rather have her than nobody. Right. What powers does the warden have in that kind of a problem with a dysfunctional health care system? Well, first of all, the administrative directors specifically say he's in charge. The contract with Wexford that Ralph Selk went through says that the warden is responsible. Is Dr. Grebe's boss. And can fire the doctor?  Or hire a new one? He has options. He can lock her out. And he can demand that she be fired. He can call Springfield. He can call the IDOC medical director in Springfield and say, we've got to get rid of her. We've got to get rid of her. But it is totally irresponsible for the warden to say, we'd rather have a body in there. Even though she's harming people, there's story after story. She kicks an injured inmate in his injured leg. She grabs away the oxygen from a patient. She's arguing all the time with co-workers. They're complaining about her. This was a big, big problem there. And for the warden to say, I'd rather have a body, a warm body there than nobody at all. And that's when Stacey Moore says, we've told him that if something egregious happens, we're going to have to fire her. So he basically blocked the termination. They had the termination papers ready. They brought in a Dr. Kim, introduced Dr. Kim to the warden and the assistant wardens. And then Dr. Kim got placed at Dixon. And then they said, well, what do we do? We're ready to terminate her. And so the warden said, no, no, no, you're not. And so it is a symbiotic relationship. But the warden is really given a contract with Wexford and the administrative directives. He's the one who's in charge. And I'd like to save some time for rebuttal.  Thank you. We have Ms. Gottlieb. Good morning. May it please the court. I am Assistant Attorney General Anna Gottlieb representing state defendants. This court should affirm judgment on behalf of defendants Nicholson and Gossett for three reasons. First, the district court here properly granted summary judgment to defendant Gossett because no reasonable jury could conclude that he acted with deliberate indifference to substantial risk of harm to plaintiff. Second, the district court properly excluded plaintiff's proposed experts because neither one was qualified to opine on the role of the warden at the facility. Third, the district court properly dismissed the claim against defendant Nicholson for failure to state a claim because plaintiff's complaint did not sufficiently put Nicholson on notice of the allegations against him. Could we start with the third point? Nicholson at the outset gets dismissed here in the Northern District by Judge Chang, right? That's correct. On statute of limitations and failure to state a claim, right? Discovery goes forward in the Central District of Illinois and Warden Gossett does his fascinating two-step on his timing issues that suggests that Nicholson may have been around at far more relevant times than Judge Chang had thought. And then there's the September 14th, 2020 motion basically to say fix all this, bring Nicholson back in. If I understand it correctly, correct me if I'm wrong, Judge Shadid denied the request to bring Nicholson back in solely on statute of limitations grounds, correct? That's correct. He said the merits pleading was moot at that point. That's correct. And you have not defended the statute of limitations rationale. Yes, as the case comes before the court. That's clearly wrong. We're not defending the statute of limitations. Right. So what we've got then is an unexplained, unjustified refusal to bring Nicholson back in in the face of all the new evidence and allegations. So I'd like to recharacterize that because when plaintiff moved to reinstate Warden Nicholson into the complaint, yes, there was a discrepancy about the dates, but other than purely saying there is a discrepancy and Nicholson was there for a longer period of time, plaintiff has not, to this time, has not shown how that change is relevant. Well, it doesn't really show though. We've got all those emails and the evidence from the summer of 2013. And it's all, they all refer to the Warden, right? It's either Gossett or Nicholson, right? Yes. But your honor, the emails and the evidence regarding summer of 2013, it still does not rise to deliberate indifference. Egregious? We got to wait for something egregious to happen? We're all holding our breath? Well, your honor. The jury couldn't find deliberate indifference there? Under the deliberate indifference standard, what plaintiff would need to show is that either of the wardens was deliberate indifference of a substantial risk to plaintiff. It's not enough to just show deliberate indifference to all of the inmates? Well, your honor, first of all, that's not what the evidence shows. And the way plaintiff has formulated the issue in this case is more of a negligence standard, which is not sufficient to. What do we make, through a summary judgment lens, you can make those kinds of arguments to a jury, but what do we make through a summary judgment lens of the wardens being told something, we're waiting in essence for something egregious to happen, and we're holding our breaths because of the dysfunction in the healthcare unit? So, I don't think that's actually in the record. What is in the record are Wexford emails. Neither Gossett or Nicholson are copied on these emails. So, first of all. We have Moore's testimony about them though, right? So, we have Moore's testimony, and I'd like to clarify what plaintiff's attorney has said. I believe she overstated what Moore's testimony does. At most, if you read Moore's testimony, it references issues with Dr. Gravey. It's not saying there were issues, such as withholding medical care, of the type that kind of led to plaintiff's injury. You've got a doctor who's hitting injured prisoners' legs, telling them to stop whining? So, again, that is in a Wexford email. I can't answer whether that was in her testimony. And we've got, forgive me, but we've got the evidence that the wardens were telling Wexford we'd rather have this Dr. Gravey rather than nobody. So, in 2013, there was another doctor who was initially slated to take over. It didn't happen, right? It didn't happen, correct. So, I think at that point, the warden had said that we'd rather have a doctor on staff than have no one here. But all this is six months before plaintiff reaches his crisis with his kidney failure, right? That's correct. So there was at least six months in there that whoever was the warden had some powers to do something in response to ensure that some adequate health care was being provided. Well, so, again, what is required, and even at the summary judgment stage, is to show that the defendant knew of a substantial risk and ignored that risk. Not ignored. Failed to take reasonable steps in response to it. That's enough. So, based on the evidence that plaintiff has presented, at most it shows that there were issues in the health care unit, but there isn't enough evidence to show that they're of the type that led to plaintiff's injury here. And I'd like to go back to the issue with the complaint. As was pointed out earlier, that complaint does not put Defendant Nicholson on notice at all. There's just conclusory language that does not rise to what we require in a well-established pleading. And with regard to summary judgment, I'd like to be clear about plaintiff's arguments here. In the briefing, plaintiff has not argued that, based on the record presented to the district court, the district court erred in granting summary judgment. Plaintiff has forfeited that argument. She only argues that the experts, precluding the experts from being part of the summary judgment record, has hindered her ability to overcome summary judgment. In her opening brief, she does not say that the district court's finding on its own on the record presented was improper. So, for that reason, that argument is forfeited. But as explained, even if we are to consider the summary judgment that was presented to the district court, there is not enough to rise to a deliberate indifference. I think what we would have here is a situation where there may have been issues in a health care unit, and that would mean that every plaintiff who had some sort of possible injury during that time, that they could then proceed to trial. They might.  We see, as you know, a lot of prison health care cases. I've never seen one this bad. We are absolutely not disputing that plaintiff's injuries were very serious. And, again, as discussed earlier, there was a settlement with Wexford and the culpable parties who provided or didn't provide the adequate medical care. But this particular part of the case is about what the warden knew and more than knew whether he disregarded that knowledge. And here, if you do look at the evidence that was presented to the district court, there is just not enough to show that there was a substantial risk of the type that was suffered here. If you're focusing just on the handling of the grievances, you may be right in late December and January of 2013 and 2014. But my concern is that the district judge overlooked the more systemic supervisory liability aspects of the summary judgment briefing and narrowed the case unduly, particularly after everybody was on notice with this evidence from the summer of 2013. I think the way the case played out in district court, it did proceed originally very much with the grievances because that was what was in the complaint. And then when the defendants filed their summary judgment motion, plaintiff responded with a much more robust claim of supervisory liability that's not in the complaint. She never moved to amend the complaint. But even if you do consider the evidence that was provided in opposition, it does not rise to the deliberate and different standard. Even under a supervisory liability theory, it is the warden who must be the one who has this knowledge. And regardless of the dates of the timeframe we're talking about here, that there isn't enough to show that the warden knew and disregarded the risk of a substantial harm of the type that plaintiff suffered. So what do you mean of the type plaintiff suffered? So, and again, there aren't too many cases that deal with this type of broader claim. So the parameters of this are very much undefined. But for instance, in the Goka case, which dealt with a different type of systematic claim that dealt with security issues. But in cases after that, the case being on notice and not enforcing a particular type of security measure doesn't mean that you can then bring a different type of claim, even if it is relating to security. So I don't think it's enough here for plaintiff to say there was dysfunction in the health care unit, and that means that this necessarily was deliberate indifference to plaintiff's injury. Plaintiff still must show deliberate indifference to what occurred to him. He has to show causation, right? Absolutely, yes. Okay, and that's where Dr. Somra's testimony may come in at trial, if a trial occurs. Okay. What was the, you say plaintiff was bringing radically new evidence into the opposition to summary judgment. What was that? Since that was coming after the motion to modify Ray Nicholson after all the discovery was obtained from Wexford. I think what that is referring to is, again, in district court, Wexford produced these emails. They were not emails that included the state defendants, and I think- You were at the depositions, I assume. Someone from our office, that's correct, yes. I think this issue goes back to what is in the pleadings and the fact that the pleadings were not amended. So if you look at the pleadings, the pleadings do show or do provide notice of allegations against the medical defendants. Well, what was happening here, I'll characterize it, then you can disagree, okay? But it looks like plaintiff got whipsawed, basically, by the early dismissal of Nicholson on inaccurate summary judgment analysis. Nicholson's out, and then the discovery goes forward, and then Gossett does this extraordinary 180 about something as basic as his date of promotion. And tries to use that to basically cast the blame back to when Nicholson was the warden. What's wrong with that picture? That's actually not how the district court ruled on summary judgment. The district court didn't say, oh, there's all this evidence between 2013, but that defendant's out. That's not what happened here. The district court, and actually, if you look at plaintiff's opposition, it does cite to evidence from 2013. Plaintiff's counsel did not limit the evidence presented, even without the expert testimony, to things that occurred prior to the date that it was established that Gossett became the warden. But the district court still found that wasn't enough because it does not rise to, it would require the jury to make a lot of speculation about the type of, I guess, issues that are discussed, and for instance, in Moore's deposition or in the Wexford emails, and again, in the Wexford emails, it is hearsay. The defendants are not copied there, and Moore's testimony does not clarify it to a point of saying, I spoke with this defendant and made him aware, or this warden made me aware of that issue. The testimony is not that clear. At most, Moore's testimony can be read as saying, I had regular meetings with the warden, and we discussed issues with Dr. Gravey, and taking that to a jury would require a lot of speculation, more than we allow to move forward beyond summary judgment. And your Honor had mentioned Dr. Samra's report and how that might go to causation if a trial were to occur. That would be true if the medical defendants were still in the case? Well, plaintiff would still have to prove that the warden's disregard for dysfunction in the health care unit actually caused him those injuries, right? Yes, Your Honor, but that's not what Dr. Samra's testimony would do. She speaks to, you know, the district court was correct in finding that she was not qualified to opine on that piece of the case, because she is a medical expert, she was a nephrologist, she can speak to his medical injuries, but she cannot speak to what the warden reasonably should have. She can testify as to what timely medical attention, competent timely medical attention, would have been able to do for the plaintiff, correct? Correct. Wouldn't that seem relevant at trial? But the issue would be whether Gossett knew and disregarded of that risk. She can't speak to it. Obviously, we're not disagreeing with each other on that. She doesn't have much to say about liability and deliberate indifference by Gossett, but she does have a lot to say about what competent, timely, non-deliberately indifferent attention would have or could have done for the plaintiff. So if Your Honor's point is to damages, that is correct. And causation. This is not a useful discussion at this point. Yes, and I would just like to say that the district court properly excluded both experts, Mr. Salke, for the reason that he basically was offering the testimony of a layperson, and with Dr. Samra, although she was qualified as a medical expert, the district court correctly found. At trial, do you think the plaintiff should be entitled to impeach Gossett with his conflicting versions as to when he was promoted? I can't. I guess can I speak to what happened here at the discovery? Why not? Why not? It doesn't make any difference. You're going to put it in the personnel record, and if they want to do it, let them do it. Sure. It's going to look ridiculous to the jury, right? Correct. Except to show that Gossett is not a reliable witness about anything. But here at the summary judgment stage where we're at, I think what the district court did was just basically say that this was not a genuine issue of fact. I think he made a mistake. He clarified it after he reviewed it. He's retired, right? That's correct. He just didn't remember the date of his promotion. That's correct. When he looked at the personnel file, it confirmed. And even after he made that correction, he repeated the mistake a month later, right? I don't think he. In the filings with the court? I don't think that's correct, Your Honor. He was deposed two times after he made the second disclosure, at least from my notes, at the second deposition. He might have been a month off, but he didn't go back to kind of the original time frame. But even so, as plaintiff has said, discovery proceeded kind of under these initial dates, so it's not as though we're in a situation where discovery was limited to the later time frame. Well, I've never seen an order like this from a district judge saying you cannot use the opposing party's testimony against him. I don't think that's what the district court's order said. This is the order that excluded plaintiff's experts. I think the district court may have been frustrated with this issue and said, if you are going to rely on this earlier date that was in the initial disclosures, you must bring some sort of evidence to support that. I understand that point as to whether this was a genuine issue. But if it's not a genuine issue, then Nicholson plays a much more central role in the case, right? That is correct. That's at least the plaintiff's theory that he's entitled to pursue. That is correct. But I think because of the way the case proceeded, we do have discovery for that entire time period, and we do not think that the district court erred when it reviewed the evidence from that entire time period. So even if we're talking about Nicholson, who was properly dismissed because he wasn't sufficiently in notice, but even if he was in the case, the evidence wouldn't change. And the evidence here just isn't sufficient to show either warden was deliberately indifferent to. I understand your position. Can I ask quickly, in Plaintiff's Appendix A-7, this is the summary judgment ruling, at page 5, the judge wrote, plaintiff's additional facts also include statements which are not, quote, undisputed, close quote. I was trying to understand the point of that. Since plaintiff doesn't have to put forth undisputed facts to oppose summary judgment, does that make sense to you? I'm not sure what the district court was referring to here. The example they give is that plaintiff says warden knew about the facility's doctors. I'm not sure what that goes to. It's a mystery to me. But plaintiff is not citing error based on any of this. And again, I'd like to reiterate that they are in their opening brief. They forfeited the argument that the district court's order on its face was an error without the expert witnesses. I see that I'm out of time. If the court has no more questions, we rest on our briefs. Okay, thank you. Thank you. Okay, Ms. Dimkar. My disposition is that if the Dovert ruling was wrong and we say that it was wrong, then the motion for summary judgment ruling has to be reversed also. Ms. Dimkar, can I again call your attention to the complaint? I'm still trying to figure out where is the allegation that the warden disregarded dysfunction in the health care unit? I see the allegations that the prison had a warden, and I see the allegations that your client was harmed. But where specifically is the allegation that the warden disregarded dysfunction in the health care unit? I don't think it's there. I don't have the complaint in front of me, but I do have paragraph numbers here, 103-140. They knew about deficient health care practices and turned a blind eye to the deficient practices. Okay, thank you. The district court said no one's ever used an expert before to try to go after a warden, but no one ever wins against a warden either. The warden always gets a pass. And it's really important to know that when plaintiff's taken to the emergency room, had his strokes and seizures, and was in a coma, the neurologist, palliative care people, ethics people were trying to decide whether to pull the plug on him. They did not call Wexford. They did not call Dr. Grebe. They did not call Eric's mother. In fact, they didn't even know he was in the hospital. They called the warden. And that's because when you're incarcerated, the warden is responsible for the health and safety of your body. It's not something he can delegate to Wexford. And so to the extent they say, well, he can have his head in the sand because, you know, the doctors are taking care of it, no, that's not right. And there are non-medical decisions he made that caused the problem here. He ignored the absenteeism of Dr. Grebe. Dr. Grebe, when she was there, she was in her office reading magazines, ordering things online. She required inmates from the infirmary to come to her. She would not go to the infirmary. She was horrible. So the health care unit did not just give substandard care. It was abominable. The care was abominable. The health care administrator said, if I recall correctly, that she was in essence using medicine to punish? Yes, a nurse ratchet kind of thing, yes. I mean, that's sort of the heart of what the Eighth Amendment doctrine here is aimed against, right? He was only back for a couple days in April of 2013, and he wrote that e-mail. And he could have done something if he was there or if there was a substitute for him. But there's nobody watching. There's nobody watching the hen house. You've got no doctor there. She's useless, the medical director. She's not there. When she's there, she doesn't do anything. And she's mean to people when she's there. And then you've got the health care unit administrator. It was vacant, and he was never replaced. There was nothing radically new. Judge Hamilton, you had a question about the radically new facts. There were no radically new facts. This defense attorney vigorously cross-examined Stacey Moore about her conversations with the warden, vigorously cross-examined Ralph Self about supervisory liability. When it came to summary judgment, there was a confusion on the part of the judge and the defense attorney between respondeat superior and supervisory liability. And they never got out of that hole they were in in being able to acknowledge that supervisory liability is a legal claim. And it's a legal claim that does not have to be alleged in the complaint. Okay, thank you. Thank you. The counsel of the case will be taken under advisement.